ALPHONSE LOUBAT, APPELLANT, vs. KIPP & YOUNG, EXECUTORS, &C., APPELLEES.

1. A deed will take effect only from the date of the *delivery*, actual or constructive.

2. Where a deed of mortgage was delivered to a third person, to be kept by him during the pleasure of the mortgagor, and subject to his further orders : *Held* that it was not an *Escrow*, and that the third person was a mere depositary.

3. It is essential to the character of an Escrow that it be delivered to a third person, to be delivered to the obligee or grantee upon the happening of some event or the performance of some condition by him.

4. It is not a universal, or even a general rule, that the doctrine of *relation* attaches to instruments of this character. It is only allowed in cases of necessity, to avoid injury to the operation of the deed, from events happening between the first and second delivery.

5. Where an attachment was levied upon the real estate of an absent debtor, and he dies pending the suit and before final judgment: *Held*, that in a contest between a mortgagee (seeking to foreclose a mortgage on the same property which was executed after the date of the levy) and the purchaser, under the judgment obtained in the same suit against the administrator, the lien of the attachment survives, and the purchaser will be protected in his title.

6. But whether such lien survives, so as to prevail against a *creditor*, who is seeking to obtain payment of his debt, under the preference given by the statute—*Quære?*

This case was decided at Tallahassee.

Appeal from Leon Circuit Court.

For the facts of the case, reference is made to the opinion of the Court.

*W. G. M. Davis* for appellant.

*M. D. Papy* for appellees.

DuPONT, C. J., delivered the opinion of the Court.

The bill in this case was filed by the appellees, as executors of the last will and testament of Charles Trinder, deceased, against the appellant and divers other individuals, and sought the foreclosure of a deed of mortgage, alleged to have been given by one George L. Middlebrook in his life time, but then deceased, to secure the payment of a debt due by note from the said Middlebrook to the said Trinder, the testator of the said appellees.

The material allegations of the bill are, that Middlebrook, on or about the 18th day of June, 1838, made his promissory note in writing, and thereby promised to pay to Trinder or order, sixty days after the date thereof, five thousand dollars, at the North River Bank, in the city of New York,

which note it is alleged remained unpaid at the time of the decease of Trinder, who died in the month of July of the same year; that after letters testamentary had been issued to the appellees, Middlebrook, for the purpose of securing the payment of the note, executed and delivered to them a deed of mortgage, embracing certain real estate situated in the city of Apalachicola, in this State, bearing date the 7th of March, 1840, and which was duly recorded on the 7th day of October of the same year; that after the time limited in the deed of mortgage for the payment of the note had fully elapsed, Middlebrook departed this life, leaving the same unpaid, and leaving a widow and three children surviving him, who are all made parties defendant to the bill; that Augustus Leftwitch, Alphonse Loubat, Nathan Baker and David G. Rainey (all of whom are made parties defendant) pretend to have some interest in the mortgaged premises; and the bill, among other things, prays that they may be compelled to disclose their respective titles, and then closes with the usual and appropriate prayer for the foreclosure of the mortgage.

The appellant, Loubat, is the only one of the defendants who has answered or who makes any resistance to the foreclosure, except the minor children of Middlebrook, who are represented by a guardian *ad litem*, and have submitted their rights and interests to the protection of the Chancellor. The answer of Loubat sets up three distinct grounds of defence, as follows, viz: First, that the demand is *stale:* second, that the demand was not presented to the administrator of Middlebrook within the two years prescribed by the statute; and, third, that he is a *bona fide* purchaser for a valuable consideration, and without notice, of the mortgaged premises from one who held as a purchaser under the *lien of an attachment*, which was levied prior to the date of the registration of the deed of mortgage. The answer also insists upon strict proof of the execution of the note and also of the execution and delivery of the deed of mortgage.

The record discloses the following state of facts, viz: That on the 4th day of May, 1840, a writ of attachment was sued out of the Superior Court of Franklin county, at the suit of the Bank of Pensacola against George L. Middlebrook, and was *levied* on the same day upon the premises embraced in the deed of mortgage; that on the 17th day of April, 1841, the defendant Middlebrook's death was suggested upon the record of the Court and an order taken for a *sci. fa.* to make parties; that on the 16th day of March, 1842, the *sci. fa.* was issued to Harvey Williams, then Sheriff of Franklin county and *ex-officio* administrator of Middlebrook, and was duly served on the next day, and he was thenceforward held as the defendant to the suit. It further appears that the judgment was duly entered against the *ex-officio* administrator on the 29th day of March, 1842, and that the writ of *fi. fa.* was issued on the 28th day of April, 1842, which was levied on the same day and the premises sold by the Marshal on the 31st day of May, 1842, at which sale Messrs. Nourse & Brooks became the purchasers of the premises in question, for the sum of $1,700. It is under this sale to Nourse & Brooks that Loubat, the appellant, seeks, through divers mesne conveyances, to protect his title as against the lien of the mortgage now sought to be foreclosed. .

The record discloses the further fact that the deed of mortgage bears date as of the 7th day of March, A. D. 1840, about two months *prior* to the levy of the writ of attachment, but that it was not admitted to record until the 7th day of October, or about five months after the levy had been made and duly entered upon the writ.

From the view which we have taken of the facts of this case, and of the law bearing thereon, it becomes unnecessary to notice the two first grounds of the defence set up by the defendant Loubat in his answer to the bill of the appellees, viz: the staleness of the demand and its non-presentation to the administrator within the two years prescribed by

the statute of non-claim. Our investigation will be confined to the consideration of the deed of mortgage with reference to its validity and the extent and compass of its operative effect, and, secondly, the priority of lien as between the attachment process and the deed of mortgage.

The deed of mortgage seems to have been prepared with much care and contains all the formal requisites necessary to pass to the mortgagee whatever interest the mortgagor should be found to have had in the mortgaged premises. It is settled, nevertheless, that however perfect the deed may have been in its formal parts, yet it did not begin to operate until it had been fully executed by a *delivery*, actual or constructive. Hence the necessity of adverting to the evidence to ascertain that date. The only evidence on the point is to be found in the deposition of R. J. Floyd, Esq., the attorney who prepared the deed, and who was also a subscribing witness to the execution of the same. In his answer to the third direct interrogatory he says: "The deed was left, after its execution, in my possession, or placed there by George L. Middlebrook. It remained there from its execution until about the 7th of October. I finally forwarded it to the complainants, by mail, on the 8th day of October, 1840, by direction of Middlebrook or the complainants, I do not recollect which." In his answer to the 5th direct interrogatory, he says: "When he executed the mortgage, Middlebrook said he did it to secure the money to his wife. If he succeeded in compromising with his creditors, he did not wish it recorded; if he did not succeed, he would write to me and wished it recorded. He said he intended this to operate as a good and valid mortgage from its date, provided he did not settle with his creditors." In his answer to the 6th direct interrogatory, he says: "The deed was left with me by Middlebrook, for what purpose I don't know, except to allow him time to settle with his creditors. I was to have it recorded whenever he wrote to me. I did promise to obey

his directions." In his answer to the first cross-interrogatory, he says: "I did not know the plaintiffs Kipp & Young; had nothing to do with them. Middlebrook left the deed with me, subject to his order." And, in answer to the 2d cross-interrogatory, enquiring if he would have delivered the deed to Kipp & Young, he says: "I don't think I would, under the instructions given by Middlebrook. I would not have delivered it to anybody. His instructions were not to deliver it or record it until he wrote to me."

From the evidence of this witness, whose testimony was taken by the complainants in the bill, it is very evident that the deed of mortgage was not delivered at the time that it bore date, but that the *instruction to deliver* was given some time after that date, and that the actual delivery did not transpire until on the 8th day of October. At what particular date this instruction was given is also left in doubt, and, as the ascertainment of that date is of importance in determining the rights of the parties, we must approximate as near to the fact as the evidence will conduct us. In answer to the 7th direct interrogatory, which enquires with regard to the length of time that Middlebrook remained in Apalachicola after the date of the deed, the witness says: "He left some time in April or May for the North, intending to return; he did not return." And, in answer to an interrogatory as to how long after the date of the deed he, the witness, remained in Apalachicola, he says: "I did not remain; I left some time in May or June, and returned in last of September or first of October." By the aid of this evidence, we are enabled to ascertain with tolerable precision the limit of time within which the instruction was given by Middleton to Floyd to deliver the deed; for, in his answer to the 10th direct interrogatory, he says: "I did receive instructions by mail at Apalachicola to have the mortgage recorded and forwarded to the complainants. I received

7

them soon after my return." Now it is shown that he left Apalachicola in May or June, and the presumption is strong that it was about the *last* of May, and that he did not return prior to the last of September, so that the date of the instruction for the delivery of the deed could not have been given *before the levy* of the attachment, which was made on the 7th day of May, 1840. This being established, it follows of course that unless the operative effect of the deed can be made to relate back to the date of the instrument, the lien of the attachment would override the lien of the mortgage, unless something had supervened to destroy that lien. With regard to the doctrine of relation, we are inclined to think that it cannot be made to operate unless the deposit of the deed with Floyd can be viewed in the light of an *escrow*. But was such the character of the instrument while in the custody of Floyd? Judge Blackstone explains the nature of an *escrow* thus: "A delivery may be either absolute, that is to say, to the party or grantee himself, or to a third person to hold until some conditions be performed on the part of the grantee, in which case it is not delivered as a *deed*, but as an *escrow*—that is as a scroll or writing, which is not to take effect as a deed till the conditions be performed, and then it is a deed to all intents and purposes."—2 Black. Com., 307.

Now, it will be noticed that to constitute this instrument an *escrow*, it was necessary that some condition must have been stipulated to be performed *by the grantees, Kipp & Young*. But was such the case? So far from this, Floyd expressly says: "I did not know Kipp & Young, and had nothing to do with them. Middlebrook left the deed with me, *subject to his own order*." It will thus be perceived that this instrument lacked the most essential requisite of an *escrow*, viz: *a condition to be performed by the grantees.* In fact, this was but an incohoate deed, wholly inoperative for any purpose whatsoever until Floyd had received instructions from Middlebrook to deliver it to the grantees.—

James vs. Vanderheyden, 1 Paige, 385. From the date of that instruction there was a constructive delivery which consummated the execution of the instrument and imparted to it vitality. Until that instruction was given the execution was incomplete, and the deed remained imperfect and subject to the exclusive control of the grantor, and might have been revoked and annulled at his will. But, even admitting that this instrument is to be recognized as a valid *escrow*, still it does not follow that its operative effect is to have relation back to the first delivery to Floyd, which is proved to have been cotemporaneous with its date; for it is not a universal or even a general rule that the doctrine of relation attaches to instruments of this character. It is only allowed in cases of necessity, to avoid injury to the operation of the deed from events happening between the first and second delivery. For example, when a *feme sole* makes a deed and delivers it as an *escrow*, and then marries before the second delivery, the relation back to the time when she was sole is necessary to render the deed valid.—1 Bouv. Law Dic., 370—*Escrow*.

This brings us to the consideration of the second point in this connection, viz: whether any matter had supervened since the levy of the attachment, which, either in law or in fact, had destroyed the lien of the attachment?

It was insisted for the complainants that the death of Middlebrook, occurring between the date of the levy under the attachment and the rendition of final judgment against his administrator, operated a dissolution of the writ of attachment and the consequent abatement of the lien acquired by that levy, and to support that position we have been referred to the ruling in the case of Sweringen vs. Administrators of Eberins, 7 Missouri Reports, 421. That was an action of assumpsit, commenced by the levy of an attachment. After the commencement of the suit, and before the rendition of final judgment, the defendant died, and after his death his

administrator appeared to the action and pleaded the general issue, and upon trial, judgment was rendered for the plaintiff in attachment, and execution awarded thereon. A *special* execution was issued against the attached property, and at the return term the administrator moved the Court to quash the writ of *fi. fa.*, which was done. In the course of the opinion delivered by the Court, it is held that the lien of the attachment was lost by the death of the defendant before final judgment, but it is very manifest from the whole reason of the Court that the conclusion announced so generally, was mainly based upon a consideration of the administration laws, which directed the order in which the debts of decedents should be paid, and we are therefore constrained to conclude that the character of the parties and the relation in which they stood to each other in the suit, as creditor and debtor, exercised a controlling influence in conducting the Court to the conclusion arrived at. Nor are we inclined to dissent from the conclusion in that particular state of case, unless, indeed, a distinction may be made in favor of a judgment obtained against the administrator himself, (about which we express no opinion.) From what is said in the opinion delivered in the Missouri case, it seems that they had in that State statutes directing the administration of assets, and the *order* in which the debts should be paid, similar to our statutes on the same subject, and in a contest before us between the creditors of the estate, or between a creditor and the administrator, we are not prepared to say that we ought not to come to the same conclusion as that arrived at in the case cited. But the case presented for our adjudication is not a contest between the creditors; neither is it one between a creditor and the administrator, seeking to obtain a preference in the payment of his debt out of the assets of the estate. This is a contest between *purchasers*— each standing upon the strength of his own title, as much so as though they were now litigating that title in an action of

ejectment. To permit the ruling in a case, where creditors are contesting for a preference of payment, to prevail in a case like this, would be quite illogical, and might conduct to incalculable mischief. Suppose, for instance, that Middlebrook, instead of having executed a deed of mortgage to Kipp & Young, had given them a deed *in fee* to the premises in question. Now, under the view which we have taken of the *delivery*, the deed would not have been fully executed, and consequently not operative until after the date of the levy of the attachment, which created a *perfect lien* upon the property attached from the date of that levy. But the defendant dies, and with him dies the prior lien of the attachment. Here the death of the defendant is made to operate so as not only to defeat the *prior* lien of the creditor, but to give to the purchaser a larger interest in the premises than the grantor possessed at the date of his purchase. A result so much at war with right and justice cannot be law.

The propriety of the distinction which we have made with respect to the nature of the contest will be readily perceived by adverting to the rights, duties and responsibilities of an administrator acting under our statute. The statute prescribing the order in which the debts of the estate are to be paid was clearly intended as an instruction to the administrator, and for his protection in the performance of his duties. Under that statute any creditor of the estate may demand the payment of his debt *in the order pointed out;* but if the administrator pay an inferior or postponed debt, it will hardly be seriously insisted that the creditor of the preferred class can recover the amount so paid from the party who has been thus paid. If there be any remedy against him, it certainly is not at the suit of the creditor of the preferred class; his only remedy is against the administrator and his sureties. But to demonstrate more fully the want of analogy between this case and that of a creditor pressing his right to a preference in the payment of his debt, we re-

mark, that however true it may be that under the operation
of our statute the lien of the attachment acquired in the life
time of the debtor gives to the attaching creditor no prefer-
ence over his co-debtors, after the death of the common
debtor, yet it is admitted law that if the administrator of
the estate either himself sell, or allow to be sold, under a
judgment obtained against him as administrator, the prop-
erty of the estate, to pay the debt belonging to a postponed
class, the purchaser's title will be good, and the creditor of
the preferred class cannot disturb him. His only remedy in
case of a deficiency of assets is against the administrator and
his sureties for a *mal-administration.*

The case of Kennedy vs. Raguet, 1 Bay, 484, and Fitch
vs. Ross, 4 Serg. & Rawls, 556, cited by the counsel for the
appellant, have afforded us but little light in this investiga-
tion, controlled as they were by the local statute. The very
paucity of authorities brought to the attention of the Court
shows that this is one of those cases which must be deter-
mined rather upon principle than precedent. We have ma-
turely considered the positions assumed by the counsel on
either side, and have been constrained to view the contest
between the parties as one of title only, and viewing it in
this light, the Court is of opinion that Loubat's title, having
relation back to the levy of the attachment, must prevail
over the deed of mortgage, which, as has been seen, did not
commence to operate until the delivery by Floyd, which
delivery was at a date subsequent to the date of the levy.
It is therefore ordered that the decree of the Chancellor be
reversed and set aside, and the cause be remanded to the
Court below, with direction to have the bill dismissed. It
is further ordered that each party shall pay his own costs,
as well those accruing in this Court as in the Court below.